UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) NO. 2:10-CR-114 |
| | ) |
| BOBBY LYNN GREENE, JR. | ) |

**REPORT AND RECOMMENDATION**

Defendant is charged in Count One of the Indictment with manufacturing marijuana; in Counts Two through Ten with being a drug user in possession of various firearms; and in Count Eleven with possessing a firearm in furtherance of the drug trafficking offense charged in Count One. The evidence supporting these charges resulted from a search of defendant's residence by two officers of the Washington County Sheriffs Department on August 16, 2010. Defendant has filed a motion to suppress that evidence, arguing that the search was (1) warrantless, and (2) done without his consent. (Doc. 20). The United States, on the other hand, insists that the search was undertaken only with the defendant's explicit and voluntary consent.[1] This motion has been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. An evidentiary hearing was held on February 16, 2011.

The Fourth Amendment to the Constitution proscribes unreasonable searches and seizures. A warrantless search is *presumptively* unreasonable, *Payton v. New York*, 445 U.S. 573 (1980). However, a warrantless search that is undertaken pursuant to a valid consent is

---

[1] Doc. 22.

a long-recognized exception to the Fourth Amendment's requirement for a warrant. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). The United States has the burden of proving by a preponderance of the evidence that the "totality of the circumstances" reveals that the defendant consented to the search, and that his consent was voluntary and knowing. *United States v. Mendenhall*, 446 U.S. 544 (1980).

Defendant claims that he never consented to the officers' search, whereas the United States insists precisely the opposite. It is, purely and simply, an issue of credibility.

The search was conducted by two criminal investigators of the Washington County Sheriffs Department, Jeff Miller and Mike Adams. Both Miller and Adams testified at the suppression hearing, as did the defendant.

*THE OFFICERS' TESTIMONY*

On Monday, August 16, 2010, Investigator Mike Adams of the Washington County Sheriff's Department was instructed by Lt. Gregg of that office that a tip had been received by the Sheriff's Office that the defendant, Bobby Greene, Jr., was growing marijuana at his residence at 173 Circle Drive, in Gray, Tennessee.[2] He was asked to talk to the defendant regarding this information. Investigator Adams asked Investigator Jeff Miller to accompany him. The officers proceeded to defendant's residence, parked, and knocked on the front door. The defendant answered the door. Investigator Adams asked the defendant if they could come into the house and speak with him. The defendant responded that he had to go

---

[2] At that time, Adams did not know the source of the tip, but later found out that it was Michael Gardiner, the R.O.T.C. instructor at Daniel Boone High School, who also was a reserve officer of the Washington County Sheriffs Department.

to a funeral[3], but he nevertheless told them they could come in and talk. Upon entering the residence, Investigator Adams told the defendant that they had information that he was growing marijuana at the residence. He asked defendant if they could search the house. Defendant told them they could. Once the consent was given, Adams remained with the defendant while Miller began a sweep of the house to ascertain whether others were present. Defendant was not patted down. Miller walked to the rear of the house to determine if other people were present, and he came to a locked door. He returned to the living room and told Adams that he had encountered a locked door. Defendant was asked if he had the key. He replied that this was his bedroom and that he had the key. Defendant unlocked the door and the three of them entered the room.

Adams did a quick scan of the room when he entered. Adams testified that he saw rolled-up currency and a residue of a white powder on a stand next to the bed. Defendant first said these items belonged to his "girlfriend," but he later admitted they were his. In proximity to the stand were two rifles. As the officers continued to walk around the bedroom, they noticed a locked closet door with electrical extension cords running beneath the door into the closet. They asked defendant if he had the key to the closet door. He responded that he thought the key was in his car. Officer Miller and the defendant left the bedroom and proceeded outside to defendant's car. As they were walking to the car, defendant repeated that he was going to be late for the funeral. Officer Miller told him that, because of the drug paraphernalia found in the bedroom, it would be a good idea if he

---

[3]Defendant was employed as a limousine driver, and it was in this capacity that he was going to attend the funeral.

cooperated.

When they approached the vehicle, the defendant advised Miller that a handgun was in the arm rest compartment of the vehicle. Officer Miller asked the defendant if he had a weapon on his person; defendant responded that he had another handgun in his pants pocket. Officer Miller secured both weapons. After defendant said he could not find the key to the closet, Miller asked him if the key to the closet might be on the same key ring as the key to the bedroom door. Defendant said he didn't know, and they proceeded back to the bedroom. Defendant then took a key from the key ring and unlocked the closet door. Adams went into the closet while Miller remained in the bedroom with the defendant.

Inside the closet, Investigator Miller saw money bags, digital scales on a shelf, a container of baggies, and a plastic cup with marijuana seeds in it. Inside the money bags was $700 in currency. There were also paper bands used to bundle large amounts of paper money. There were also two small bags of processed marijuana in the closet.

At this point, Investigator Adams read the defendant his Miranda rights. Defendant responded that he understood the rights. Based upon the presence of the marijuana seeds in the closet, Adams asked defendant if the residence had a basement. Defendant replied that it did, but it could only be accessed from outside of the house. The three of them proceeded outside to a padlocked door, which the defendant unlocked.

Upon opening the basement door, a rush of heat came from within. Adams could see lawnmowers and other items normally stored in a basement, but at the back of the room was a plastic "wall" made of plastic sheathing. Between the sheets of plastic, Adams could see a glow on the other side of the plastic. There was ductwork leading into the enclosure. He

could smell a strong odor of cultivated marijuana. Adams peered between a slit in the plastic sheets, looked inside, and saw several marijuana plants growing. Adams asked Miller to call Captain Judy, their superior, to advise that they had found a "grow lab" and that they needed other officers to assist in dismantling it. He also asked Miller to request a drug-detecting dog to come to the house to ascertain if there was more marijuana present that they had not discovered.

At some point, while the officers and the defendant were in the living room, a van driven by a woman pulled up outside the residence. Officer Miller went outside and talked to her. She told him that she was sleeping on the couch in the house. Officer Miller doesn't recall the woman's name. He told her to leave, which she did.

When the other officers arrived, approximately 20 to 30 minutes later, Adams procured a waiver of Miranda rights form from them. He again read the defendant his rights and defendant signed the waiver form. On another form, Adams transcribed defendant's statement, which defendant subsequently signed.

Although Adams usually had pre-printed "consent to search" forms with him, he did not on this occasion because he kept them in his car, and he had ridden with Miller in his vehicle.

Defendant was never placed under arrest, and at no time did they threaten defendant or coerce him in any way. Neither of the officers drew their weapons at any time.

### *DEFENDANT'S TESTIMONY*

Defendant testified that he had no prior criminal record of any kind. He acknowledged that all the guns found in the house were his, and that he had a permit to carry

a handgun. He stated he routinely carries a handgun while driving the limousine for his protection and the protection of his clients.

Defendant insists that, although he agreed to talk to the officers, he never invited them to come into his house; he said they entered without consent or invitation. Once inside, Adams told him of the information he had regarding a marijuana grow operation, at which point Adams (not Miller) walked to the rear of the house, as Miller inspected defendant's drivers license. At no time did either officer ask for his consent to search his house.

Contrary to Miller's testimony, defendant testified that his bedroom door was standing open, not locked; only the door to the closet was locked. According to defendant, he was told to unlock the closet door, or "he would go to jail for a long, long time." Based on that threat, defendant opened the closet door and thereafter the basement door.

He testified that he was not given his *Miranda* warning after the officers' entry into his closet as they testified; rather, he was given the warning only after the additional officers arrived to dismantle the marijuana-grow equipment.

Interestingly, he was vague when cross-examined about his signature on the *Miranda* waiver form (Ex. 1). He testified that it "looks kinda like" his signature, but he "couldn't say for sure if he signed it."

He was not so equivocal in his testimony that (1) he never invited the officers to enter his house; (2) not only did he not consent to their search, he was never asked to do so; and (3) he opened the closet and basement doors only because of Adams' threat regarding a lengthy incarceration.

***CONCLUSION***

The determinative issue is credibility; who is believed, the officers, or defendant?

The evidence preponderates in favor of the United States. Therefore, it is respectfully recommended that defendant's motion to suppress evidence (Doc. 20), be denied.[4]

Respectfully submitted,

    s/ Dennis H. Inman
United States Magistrate Judge

---

[4] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).